## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 09-349(2) (DWF/SER) |
| Plaintiff, | |
| v. | **ORDER AND MEMORANDUM** |
| Mark S. Sutton, | |
| Defendant. | |

Robert M. Lewis, Assistant United States Attorney, United States Attorney's Office, counsel for Plaintiff.

William M. Orth, Esq., Law Office of William M. Orth, counsel for Defendant.

The above-entitled matter is before the Court upon the motion of Defendant Mark S. Sutton ("Defendant"), for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure or, alternatively, for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  (Doc. No. 147.)  The Government opposes Defendant's motion in all respects.

Based upon the written submissions and presentations of counsel, the Court having reviewed the file in this matter, and the Court being otherwise duly advised in the premises, the Court hereby enters the following:

**ORDER**

1.      Defendant Mark S. Sutton's motion for judgment of acquittal, pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, (Doc. No. [147]), is hereby **DENIED**.

2.      Defendant Mark S. Sutton's motion for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, (Doc. No. [147]), is hereby **DENIED**.


Dated:  May 13, 2011                    s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge


**MEMORANDUM**

**Introduction**

Defendant Mark S. Sutton went to trial pursuant to a three count indictment. Count 1 of the indictment charged Defendant with the crime of Conspiracy to Commit Mail Fraud and Wire Fraud.  Specifically, the indictment asserted that from May 2000 to about June 2008, Defendant knowingly conspired with at least one other person to commit mail fraud or wire fraud.  Count 1 of the indictment alleged that Defendant knowingly conspired with at least one other person, Joseph Finney ("Finney"), to commit mail fraud or wire fraud by raising money from investors and programs that the Defendant and others promoted instead of investing the money, as promised, and spent the money on themselves.  Count 1 of the indictment included allegations that the

Defendant and others created and used multiple corporate names and bank accounts, concealed their personal receipt of investor funds, and concealed information from investors that the investors would have found important.

Count 2 alleged the crime of Money Laundering Conspiracy. Specifically, Count 2 of the indictment charged that the Defendant, from sometime prior to January 2, 2001 to on or about July 22, 2005, conspired with at least one other person to commit money laundering. The indictment specifically alleged that Defendant conspired with Finney and others to engage in financial transactions involving the investors' funds that were illegal in one of three ways: the transactions involved more than $10,000 in funds from the scheme; the transactions were designed to promote the scheme to defraud; or the transactions were designed to conceal or disguise the location, source, ownership, or control of the funds from the alleged scheme.

Count 3 of the indictment charged the Defendant with the crime of Conspiracy to Defraud the United States. Specifically, Count 3 of the indictment asserted that from on or about November 1999 and continuing up to a time period including October 28, 2005, the Defendant knowingly conspired with at least one other person, John Higginbotham ("Higginbotham"), in hiding his assets from the IRS and to assist Higginbotham in a filing with the government allegedly frivolous and obstructionist documents so that Higginbotham could evade paying his taxes that have been due and owing since at least 1992 and 1993 when, admittedly, Defendant and Higginbotham did not meet until 1998.

The evidence presented at trial, when viewed in its proper context, establishes beyond a reasonable doubt that Defendant committed the crimes set forth in Counts 1, 2, and 3.

Notwithstanding the Court's skepticism of the way in which the examination of Finney was handled to the extent he was never asked specifically what he told the Defendant about the phoney and false monthly statements, Defendant received a fair trial from a fair and impartial jury. Moreover, sufficient evidence exists to support the verdict reached by the jury on Counts 1, 2, and 3 of the indictment. Therefore, the Court has denied Defendant's Rule 29(c) motion for judgment of acquittal and Rule 33 motion for a new trial.

**Sufficiency of the Evidence**

When considering a challenge to the sufficiency of the evidence to support a guilty verdict, the Court must view the evidence in the light most favorable to the verdict and accept, as established, all reasonable inferences supporting the verdict. *See United States v. Maggard*, 156 F.3d 843, 846 (8th Cir. 1998), *cert. denied sub nom. Maggard v. United States*, 119 S. Ct. 1094 (1999) and *cert. denied*, 119 S. Ct. 1372 (1999).

A jury's verdict will be overturned only when no reasonable jury could have found defendant guilty beyond a reasonable doubt. *United States v. Santos-Garcia*, 313 F.3d 1073 (8th Cir. 2002). The evidence at trial, including the circumstantial inferences that emanate from the evidence presented by the United States, establish, by proof beyond a reasonable doubt, the guilt of the Defendant on Counts 1, 2, and 3.

**Counts 1 and 2**

When the evidence is viewed in the light most favorable to the Government, including reasonable inferences supporting the verdicts reached, the evidence establishes that Defendant participated in the fraud from the beginning when he signed up his first investors in 2000 and chose not to disclose his commission structure. The jury had critical credibility decisions to make. The jury rejected the Defendant's testimony in which he minimized his knowledge of high yield investments and kept repeating that all he did was the paperwork. The irony behind Defendant's asserted ignorance to high yield investments is that Joseph Finney came across as the consummate con man, while on the witness stand testifying, "I did not know much about it at the time," referring to high yield investment programs. Of course neither Defendant nor Finney informed the investors that they knew little or nothing about high yield investments. This testimony of ignorance and innocence, as asserted by Defendant, which was rejected by the jury, was made in the context of FBI Special Agent Paul Jacobs' testimony wherein he testified there are no true high yield investment programs because these programs are, by their very nature, fraudulent.

Whether the eNvestclub was a scheme to defraud from the beginning or not, in the words of Ken Tolberg–whose wife met Defendant at their church and then went to the Defendant's house for a 1-1 ½ hour meeting, at which a 100% return was promised–"It sounded too good to be true."

Much was made by the United States and the Defendant that Finney was either found to be credible by the jury or, from the Defendant's point of view, even Finney believed that eNvestclub was legitimate, at least at the beginning. However, an equally plausible view of the evidence, when viewed in the light most favorable to the verdict, is that the jury concluded that simply because a consummate con man, like Finney, believed something not to be a fraud, does not make it so, even if he asserted that he never planned a fraud scheme at the beginning. An inescapable inference from the evidence, consistent with the verdicts reached by the jury, is that Finney and Defendant both knew what to disclose and what not to disclose to investors when both men knew nothing was being invested the first six months while monthly commissions were being paid. Such commissions were never disclosed to the investors, irrespective of what Finney did or did not tell Defendant about the false and phoney monthly statements.

Consequently, even though the Court continues to have lingering doubts about the circumspect way in which the Government treated Finney by being careful not to ask him precisely what he told Defendant, the inescapable inference, when the evidence is viewed in the light most favorable to the Government, is that Joseph Finney, the Defendant, and others, including Ronald Gruber, knew exactly the fraud that was going on and what not to disclose to the investors. Defendant knew of the criminal charges and the fact that Finney had pled guilty in South Carolina, but failed to disclose that fact, for obvious reasons, to any of the investors. Thus, whether eNvestclub was originated or intended as a Ponzi scheme from the very beginning, based upon the evidence before the Court, it

6

was clear that it was a scheme to defraud, as found by the jury, close to its inception. Even the most generous view of the evidence in Defendant's favor suggests, at a minimum, that from the very beginning, Defendant turned a blind eye to what was clearly going on, as found by the jury. Based upon the evidence and the credibility determinations by the jury, they saw the case for what it was. Defendant was sufficiently concerned to start clandestinely taping Finney, and selectively failed to disclose key facts to investors, knowing full well that the profits would cease and that investors would leave or try to leave. As noted above, the jury had a credibility decision to make with respect to the innocence proclaimed by Defendant and the way in which Finney minimized his fraudulent intent and behavior. The verdict clearly establishes that the jury rejected Defendant's proclamations of ignorance and innocence, as well as his repeated claims that he was simply a "dupe."

Consequently, when the evidence is examined in the light most favorable to the prosecution and resolving any conflict in the evidence in favor of the jury's verdict, the Court finds and concludes that any reasonable jury could have found Defendant guilty beyond a reasonable doubt of Counts 1 and 2 of the indictment.

**Count 3**

The Court finds and concludes with respect to Count 3, Conspiracy to Defraud the United States, that there was sufficient evidence to prove beyond a reasonable doubt the guilt of Defendant of Count 3. Higginbotham met Defendant in the fall of 1998 at a time when Higginbotham's tax liability was $268,000. Admittedly, the tax liability had been

due and owing and incurred in the tax years 1991 and 1992.  And, as pointed out during the trial and by defense counsel in its submissions before the Court, Higginbotham had pled guilty before the Court in July 2007 to willful invasion of taxes pursuant to a plea agreement that did in fact include a cooperation agreement to testify and cooperate against Defendant.  Moreover, Defendant was not charged with or convicted of conspiracy to evade federal income tax at the time it was due in the years 1991 through 1993.

     The Court agrees with the Government and, more importantly, so did the jury, that the Defendant reached an agreement or understanding with Higginbotham to help hide Higginbotham's assets from the IRS and to assist Higginbotham to file evasive, obstructionist, frivolous, and misleading paperwork with the IRS.  Defendant's activities ranged from creating bogus trust structures as a vehicle to hide assets of Higginbotham, to putting personal property, as well as Higginbotham's home, into a trust.  In fact, Defendant became one of the trustees.  Defendant established a false lien on Higginbotham's vehicle with the sole purpose to shield it from the IRS.  And, in the words of Higginbotham, "The Defendant led me through the process to protect my assets from creditors and the IRS."  While the Court may also have lingering doubts about Higginbotham's credibility and his desire to reap the benefits of the plea agreement, the jury, when the evidence is viewed in the light most favorable to the verdict, clearly found Higginbotham's testimony credible, and the Court concludes that there was a factual basis in the record and sufficient evidence for the jury to do so.

It may well be that Higginbotham came across as a true con man, much like Finney, but without the depth of experience of Finney, and without Finney's salesmanship skills.  However, when the evidence is viewed in the light most favorable to the verdict, a jury's conclusion that Defendant was working with, conspiring with, and assisting individuals like Finney and Higginbotham, when it was obvious to any reasonable person what each was doing, is entirely consistent with the guilty verdicts reached in this trial.

**Defendant's Motion for a New Trial**

The verdict reached by the jury in this case on all three counts was not contrary to the greater weight of the evidence.  The Court was admittedly skeptical, if not critical, of the lack of knowledge by the IRS of the tax status of the Defendant during the trial, especially when there was no allegation of any irregularity in Defendant's individual tax situation.  In fact, the lead agent testified at trial that he was unaware of the Defendant's individual tax status.

However, the conclusion the Court reaches, to which the Court is well aware that defense counsel takes strenuous exception, given the argument during the trial and post-trial submissions, is that not only was there no prejudice in the joinder of Count 3 to Counts 1 and 2, but, if anything, given the tax status of the Defendant, Count 3 in many respects acted almost as a mitigating circumstance, rather than a prejudicial issue spilling onto Counts 1 and 2.  The nexus, of course, even assuming the legitimate or unknown tax status of the Defendant, are the similarities between Higginbotham's involvement in

Sugar Bay Trust and the other so-called high yield investment programs Finney was involved in. In the eyes of the jury, both Higginbotham and Finney likely came across as con men, with or without their connection to a church or the apparent true belief in their cause.

Based upon the evidence, no miscarriage of justice will occur if the jury's verdicts are allowed to stand. The Court accepts that the decision to grant or deny a new trial is a matter of discretion with the Court and that there are indeed instances of manifest injustice that require the granting of such motions. *See United States v. Lincoln*, 630 F.2d 1313 (8th Cir. 1980); *United States v. Lacey*, 219 F.3d 779 (8th Cir. 2000); *United States v. Espinosa*, 300 F.3d 981 (8th Cir. 2002). The case before the Court is not such a case. The interests of justice do not require this Court to vacate any of the verdicts rendered in this case by the jury that, in the Court's view, fairly and impartially evaluated the evidence.

**Conclusion**

No one can doubt that a judge must exercise constitutional vigilance in every criminal trial so that the interests of justice are served, regardless of the verdicts. After all is said and done, however, neither the proper exercise of this Court's discretion nor the interests of justice obligate this Court to grant a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Nor do the interests of justice require this Court to vacate the verdicts rendered in this case by the jury.

For the reasons stated, the Court respectfully denies Defendant's motions for judgment of acquittal or for a new trial.

D.W.F.